# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>NL INDUSTRIES, INC., )<br>ACF INDUSTRIES, LLC, )<br>AMERICAN PREMIER UNDERWRITERS, INC., )<br>DII INDUSTRIES LLC, )<br>EXIDE TECHNOLOGIES, and )<br>GOULD ELECTRONICS INC., )<br>)<br>Defendants. )<br>) | CIVIL ACTION NO. 1:17-cv-124 |

## COMPLAINT

The United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the Environmental Protection Agency (hereafter "EPA") for Region II, files this complaint and alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action instituted pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act, as amended ("CERCLA"), 42 U.S.C. § 9607. In this action, the United States seeks to recover costs incurred and to be incurred by the United States in response to the release or threatened release of hazardous substances at or from the NL Industries Depew Plant Superfund Site ("Site") located in the Village of Depew, Erie County, New York.

1

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action and over the parties pursuant to Sections 107 and 113(b) of CERCLA, 42 U.S.C. §§ 9607 and 9613(b), and 28 U.S.C. §§ 1331 and 1345.

3. Venue is proper in this judicial district pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), and 28 U.S.C. §§ 1391(b), because the releases or threatened releases of hazardous substances that gave rise to these claims occurred in this district, and because the Site is located in this district.

## DEFENDANTS

4. Defendant NL Industries, Inc. ("NL") is a New Jersey corporation and is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

5. Defendant ACF Industries, LLC, ("ACF") is a Delaware limited liability company and is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

6. Defendant American Premier Underwriters, Inc. ("APU") is a Pennsylvania corporation and is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

7. Defendant DII Industries, LLC ("DII") is a Delaware limited liability company and is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

8. Defendant Exide Technologies ("Exide") is a Delaware corporation and is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

9. Defendant Gould Electronics Inc. ("Gould") is an Arizona corporation and is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

## **STATUTORY BACKGROUND**

10. CERCLA was enacted in 1980 to provide a comprehensive governmental mechanism for abating releases and threatened releases of hazardous substances and other pollutants and contaminants, and for funding the costs of responding to releases of hazardous substances. *See* 42 U.S.C. §§ 9604(a), 9601(25).

11. Under Section 104(a)(1) of CERCLA, 42 U.S.C. § 9604(a)(1), as amended:

> Whenever (A) any hazardous substance is released or there is a substantial threat of such a release into the environment, or (B) there is a release or a substantial threat of release into the environment of any pollutant or contaminant which may present an imminent and substantial danger to the public health or welfare, the President is authorized to act, consistent with the national contingency plan, to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time (including its removal from any contaminated natural resource), or take any other response measure consistent with the national contingency plan which the President deems necessary to protect the public health or welfare or the environment . . . .

12. Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides in pertinent part:

> Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this Section –
>
> (1) the owner and operator of a vessel or a facility,
>
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, [and]
>
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances,
>
> \* \* \*
>
> shall be liable for –
>
> (A) all costs of removal or remedial action incurred by the United States Government . . . not inconsistent with the National Contingency Plan;

    (B)    any other necessary costs of response incurred by any other person consistent with the national contingency plan; [and]

    (C)    damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release . . . .

## DESCRIPTION OF SITE AND FACTUAL BACKGROUND

13.    The Site comprises approximately 110 residential properties and a right of way adjacent to a former facility owned and/or operated by NL Industries or its predecessors. The soil at the residential properties and right of way was contaminated with lead prior to EPA's response action.

<u>The NL Facility</u>

14.    From approximately 1892 to 1972, NL or its predecessors owned and/or operated an approximately 7.5-acre facility at 3241 Walden Avenue, Depew, New York ("NL Facility"), at which it conducted brass foundry operations including casting brass bearings that contained approximately 20% lead, lead smelting operations, the production of an alloy of tin, lead, copper and antimony known as babbitt, and the production of lead products including lead pipe.

15.    The NL Facility is located across the street from the residential portion of the Site, and includes the right of way portion of the Site.

16.    The predominant wind direction blows from the NL Facility toward the Site.

17.    Brass foundry operations, lead smelting, babbitt production, and other operations at the NL Facility resulted in the aerial deposition of lead from the NL Facility's chimneys and smoke stacks to the Site.

18.    Spent foundry sand and slag were lead-contaminated solid wastes produced by the NL Facility's smelting, foundry, and lead product operations.

19. Spent foundry sand and slag from the NL Facility was deposited at the Site.

20. As a result of the operations at the NL Facility, there have been releases of hazardous substances into the environment at the Site.

NL Corporate Chain

21. From approximately 1892 to 1899, the Buffalo Brass Company ("Buffalo Brass") operated a brass foundry and machine shop on Walden Avenue in Depew.

22. In or about 1899, Magnus Metal Company ("Magnus") acquired Buffalo Brass.

23. In or about 1936 or 1937, Magnus was merged into National Lead Company.

24. From the time National Lead Company acquired Magnus to about 1971, the NL Facility was operated as Magnus Metal, a division of the National Lead Company.

25. In or about May 1971, National Lead Company changed its name to NL Industries, Inc.

The Gould Facility

26. In the late 19th and 20th century, predecessors-in-interest to DII forged metal parts for railcars and manufactured lead storage batteries in Depew, New York in the area east of Transit Road and between the Delaware Lackawanna & Western Railroad to the north and the Erie Railroad to the south (the "Gould Facility").

27. The Gould Facility is within half a mile of the Site.

28. Beginning in approximately 1893 the Gould Coupler Company began operating a foundry at the Gould Facility, originally casting metal parts for railcars, and later also casting metal parts for tanks and bomb casings.

29. Foundry operations continued at the Gould Facility until approximately 1986.

30. As of 1985, baghouse dust from the metal foundry at the Gould Facility contained lead at levels rendering the dust hazardous waste.

31. Prior to the installation of emission controls, this lead-contaminated dust was emitted to the air from the Gould Facility metal foundry stacks.

32. Coal and oil were the fuel sources used to melt and refine metals in the metal foundry at the Gould Facility.

33. Emissions from the burning of coal and oil at the Gould Facility metal foundry, including lead emissions, were vented from a smokestack that was 180 feet tall in the 1920s.

34. The metal foundry at the Gould Facility used scrap metal containing lead as a raw product that it would melt down to cast metal parts.

35. The burning of coal and metal foundry operations at the Gould Facility foundry resulted in the air deposition of lead at the Site.

36. Slag and spent foundry sand generated by the metal foundry at the Gould Facility were solid wastes containing lead.

37. Spent foundry sands from the Gould Facility were dumped in a vacant area to the west of Transit Road across the street from the foundry buildings.

38. Periodically, DII's predecessors arranged for waste haulers to transport spent foundry sand containing lead generated at the Gould Facility away from its facility. At least some of that foundry sand was deposited along the road in a neighboring community, including at the high school.

39. Slag generated by the metal foundry at the Gould Facility was used in road beds in Depew.

40. Waste cinders generated by the Gould Facility may have contained lead.

41. DII's predecessors made waste cinders from the Gould Facility available to the public.

42. In or about 1898 or 1899, the Gould Coupler Company formed the Gould Storage Battery Company to produce lead-acid batteries for railcar lighting systems.

43. The lead-acid battery manufacturing operation was located in the southwestern portion of the Gould Facility.

44. Predecessors in interest to DII, Gould, and Exide owned and/or operated the lead-acid battery manufacturing business at the Gould Facility.

45. Lead-acid battery manufacturing continued at the Gould Facility until approximately 1958, including the manufacture of submarine batteries for a portion of the time.

46. As part of the lead battery manufacturing process, predecessors to Gould, Exide, and DII produced lead oxide paste in part by pulverizing lead balls into lead dust.

47. Lead-acid battery production including lead oxide production at the Gould Facility resulted in the aerial deposition of lead from the facility's chimneys and vents to the Site.

48. As a result of the operations at the Gould Facility, there have been releases of hazardous substances into the environment at the Site.

<u>DII Corporate Chain</u>

49. Gould Coupler Company was incorporated in New York in 1903.

50. In or about 1925 Symington Company acquired 90% of outstanding shares of Gould Coupler Company.

51. In or about 1936 Symington Company and Gould Coupler Company merged, with Symington Company the surviving entity.

52. In or about 1936 Symington Company was renamed Symington-Gould Corporation.

53. In or about 1958 Symington-Gould Corporation changed its name to Symington Wayne Corporation.

54. In or about 1968 Symington Wayne Corporation merged with Dresser Industries Inc., with Dresser Industries Inc. the surviving entity.

55. In or about 1998 Dresser Industries Inc. merged with Halliburton N.C., Inc., with Dresser Industries Inc. the surviving entity.

56. In or about 2002 Dresser Industries Inc., converted to an LLC and was renamed DII Industries LLC.

Gould Corporate Chain

57. The Gould Storage and Battery Company, a subsidiary of the Gould Coupler Company, was incorporated in New York in 1903.

58. In or about 1930, the National Battery Company acquired the Gould Storage and Battery Company.

59. In or about 1950, National Battery Company changed its name to Gould-National Batteries, Inc.

60. In or about 1969, Gould-National Batteries, Inc. changed its name to Gould Inc.

61. In or about 1994 Gould Electronics Inc., purchased all assets and liabilities of Gould Inc.

62. In or about 1998 Gould Electronics Inc., merged with American Microsystems Holdings Inc. The surviving entity was renamed GA-TEK Inc.

63. In or about 2001 GA-TEK Inc. changed its name to Gould Electronics Inc.

64. In or about 2003 Nikko Materials USA Inc., acquired the assets and liabilities of Gould Electronics Inc.

65. In or about 2006 Nikko Materials USA Inc., changed its name to Gould Electronics Inc.

Exide Corporate Chain

66. On or about January 1, 1983, Gould Inc. (mentioned above in Paragraph 60) transferred all of the assets and liabilities of Gould Inc.'s lead-acid battery operations to GNB Batteries, Inc.

67. In or about 1984, GNB Batteries, Inc. changed its name to GNB, Inc.

68. In or about 1993, GNB, Inc. changed its name to GNB Battery Technologies Inc.

69. In or about 1994, GNB Battery Technologies Inc. changed its name to GNB Technologies Inc.

70. In or about 2000, Exide Corporation merged with GNB Technologies, Inc., with Exide Corporation the surviving entity.

71. In or about 2001, Exide Corporation changed its name to Exide Technologies.

The ACF Facility

72. Between approximately 1890 and approximately 1926, ACF's predecessors owned and intermittently operated a railcar manufacturing and repair facility in Depew, NY, the "ACF Facility."

73. The ACF Facility is within a quarter mile of the Site.

74. The ACF Facility cast iron railcar wheels and other iron parts in its iron foundry.

75. During World War I, the ACF Facility produced artillery shells.

76. The iron foundry at the ACF Facility resulted in lead emissions to the outside air.

77. The ACF Facility released coal furnace emissions to the outside air from a 150 foot tall smokestack.

78. The ACF Facility coal furnace emissions included lead emissions.

79. Wind carried lead from the ACF Facility to the Site.

80. Lead originating at the ACF Facility was deposited onto land at the Site.

ACF Corporate Chain

81. In approximately 1890, the Union Car Company constructed the railcar manufacturing and repair shop at the ACF facility.

82. From approximately 1890 to 1899 Union Car Company owned and operated the ACF Facility.

83. In 1899, Union Car Company merged with 10 other railroad car building companies to form American Car and Foundry Company.

84. American Car and Foundry Company owned the ACF Facility and was its only operator from 1899 to 1926.

85. In 1954, American Car and Foundry Company changed its name to ACF Industries, Inc.

86. In 2003, ACF Industries, Inc. changed its name to ACF Industries, LLC.

The APU Facility

87. From approximately 1893 to approximately 1930, APU's predecessors owned and operated a locomotive repair facility approximately 500 meters east of the Site's eastern border, the "APU Facility."

88. The APU Facility included a brass foundry.

89. The brass melted and cast by APU's predecessors at the APU Facility contained approximately 9%-11% lead.

90. The brass foundry would have generated waste foundry sands contaminated with lead, zinc, and copper.

91. APU's predecessors poured Babbitt, an alloy containing up to 90% lead, at the APU Facility.

92. The Brass foundry and Babbitt pouring operations at the APU Facility resulted in lead emissions to the outside air.

93. The APU Facility released coal furnace emissions to the outside air from a 135 foot tall smokestack.

94. The APU Facility burned approximately two tons of coal per day.

95. The APU Facility coal furnace emissions included lead emissions.

96. Wind carried lead from the APU Facility to the Site.

97. Lead originating at the APU Facility was deposited onto land at the Site.

APU Corporate Chain

98. From 1893 to 1911 the New York Central and Hudson River Railroad Company owned and operated the locomotive repair shop at the APU Facility.

99. In 1914, New York Central and Hudson River Railroad Company and 10 other railroads consolidated to form the New York Central Railroad, Inc.

100. The New York Central Railroad, Inc. continued to own and operate the locomotive repair shop at the APU Facility until 1930, when the locomotive repair shop closed.

101. In 1960 the New York Central Railroad, Inc. merged into a different entity also called the New York Central Railroad, Inc.

102. In 1968, the New York Central Railroad, Inc. merged into Pennsylvania Central Railroad Company.

103. That same year, Pennsylvania Central Railroad Company changed its name to the Pennsylvania New York Central Transportation Company, and then to Penn Central Company.

104. In 1969, Penn Central Company changed its name to Penn Central Transportation Company.

105. In 1978, Penn Central Transportation Company went through a bankruptcy reorganization with Penn Central Corporation the surviving entity.

106. In 1994, Penn Central Corporation changed its name to American Premier Underwriters, Inc.

Summary of Response Actions

107. In 2003, the New York State Department of Environmental Conservation asked that EPA evaluate a block of residential properties for a potential CERCLA removal action.

108. A removal action was performed at the Site in three phases.

109. In Phase 1, NL removed lead-contaminated soils from approximately 36 residential properties located west of Transit Road and north of Walden Avenue pursuant to a 2004 Administrative Order on Consent with EPA. EPA issued a final Pollution Report for Phase 1 of the removal action in February 2007. EPA has been reimbursed for some but not all of its Phase 1 costs.

110. In Phase 2, EPA removed lead-contaminated soils from approximately 70 single-family residences east of Transit Road and north of Walden Avenue, starting in 2008. EPA issued a final Pollution Report for Phase 2 in September 2012. EPA has not been reimbursed for its Phase 2 costs.

111. In Phase 3, NL removed lead-contaminated soils in right-of-way about 25 feet wide and 1,500 feet long along Walden Avenue, pursuant to a second Administrative Order on Consent with EPA. EPA issued a final pollution report for Phase 3 of the removal action in January 2013. EPA has been reimbursed for some but not all of its Phase 3 costs.

112. In undertaking response actions to address the release or threat of release of hazardous substances at the Site, EPA incurred unreimbursed response costs of approximately $8.2 million, exclusive of interest.

## GENERAL ALLEGATIONS

113. The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

114. The NL Facility is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

115. The foundry at the Gould Facility is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

116. The battery plant at the Gould Facility is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

117. The ACF Facility is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

118. The APU Facility is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

119. Lead is a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

120. There have been releases or threatened releases of a hazardous substance into the environment at or from the NL Facility, within the meaning of Sections 101(14), 101(22) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(14), 9601(22) and 9607(a).

121. There have been releases or threatened releases of a hazardous substance into the environment at or from the battery plant and foundry at the Gould Facility within the meaning of Sections 101(14), 101(22) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(14), 9601(22) and 9607(a).

122. There have been releases or threatened releases of a hazardous substance into the environment at or from the ACF Facility, within the meaning of Sections 101(14), 101(22) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(14), 9601(22) and 9607(a).

123. There have been releases or threatened releases of a hazardous substance into the environment at or from the APU Facility, within the meaning of Sections 101(14), 101(22) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(14), 9601(22) and 9607(a).

## FIRST CLAIM FOR RELIEF
### (NL)

124. Paragraphs 1 through 123 are realleged and incorporated herein by reference.

125. Defendant NL is a person, or a successor-in-interest to a person, who at the time of disposal of any hazardous substance owned and/or operated a facility from which there was a release or threatened release of hazardous substances which has caused and continues to cause EPA to incur response costs.

126. Pursuant to Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), Defendant NL is jointly and severally liable to the United States for unreimbursed response costs incurred and to be incurred by the United States in connection with the Site, including enforcement costs and interest on all such costs.

127. As a result of the releases or threatened releases of a hazardous substance at or from the Site, EPA has incurred and will continue to incur response costs, within the meaning of Sections 101(25) and 107 of CERCLA, 42 U.S.C. §§ 9601(25) and 9607, to respond to the releases or threatened releases of a hazardous substance at or from the Site.

128. The response costs incurred by EPA in connection with the Site were incurred in a manner not inconsistent with the National Contingency Plan, promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, and codified at 40 C.F.R. Part 300.

## SECOND CLAIM FOR RELIEF
### (ACF)

129. Paragraphs 1 through 123 are realleged and incorporated herein by reference.

130. Defendant ACF is a person, or a successor-in-interest to a person, who at the time of disposal of any hazardous substance owned and/or operated a facility from which there was a release or threatened release of hazardous substances which has caused and continues to cause EPA to incur response costs.

131. Defendant ACF is also a person, or a successor-in-interest to a person, who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances at a facility from which there was a release or threatened release of hazardous substances which has caused and continues to cause EPA to incur response costs.

132. Pursuant to Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), Defendant ACF is jointly and severally liable to the United States for unreimbursed response costs incurred and to be incurred by the United States in connection with the Site, including enforcement costs and interest on all such costs.

133.  Pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), Defendant ACF is jointly and severally liable to the United States for unreimbursed response costs incurred and to be incurred by the United States in connection with Site, including enforcement costs and interest on all such costs.

### THIRD CLAIM FOR RELIEF
### (APU)

134.  Paragraphs 1 through 123 are realleged and incorporated herein by reference.

135.  Defendant APU is a person, or a successor-in-interest to a person, who at the time of disposal of any hazardous substance owned and/or operated a facility from which there was a release or threatened release of hazardous substances which has caused and continues to cause EPA to incur response costs.

136.  Defendant APU is also a person, or a successor-in-interest to a person, who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances at a facility from which there was a release or threatened release of hazardous substances which has caused and continues to cause EPA to incur response costs.

137.  Pursuant to Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), Defendant APU is jointly and severally liable to the United States for unreimbursed response costs incurred and to be incurred by the United States in connection with the Site, including enforcement costs and interest on all such costs.

138.  Pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), Defendant APU is jointly and severally liable to the United States for unreimbursed response costs incurred and to be incurred by the United States in connection with Site, including enforcement costs and interest on all such costs.

## FOURTH CLAIM FOR RELIEF
### (DII)

139. Paragraphs 1 through 123 are realleged and incorporated herein by reference.

140. Defendant DII is a person, or a successor-in-interest to a person, who at the time of disposal of any hazardous substance owned and/or operated a facility from which there was a release or threatened release of hazardous substances which has caused and continues to cause EPA to incur response costs.

141. Defendant DII is also a person, or a successor-in-interest to a person, who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances at a facility from which there was a release or threatened release of hazardous substances which has caused and continues to cause EPA to incur response costs.

142. Pursuant to Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), Defendant DII is jointly and severally liable to the United States for unreimbursed response costs incurred and to be incurred by the United States in connection with the Site, including enforcement costs and interest on all such costs.

143. Pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), Defendant DII is jointly and severally liable to the United States for unreimbursed response costs incurred and to be incurred by the United States in connection with Site, including enforcement costs and interest on all such costs.

## FIFTH CLAIM FOR RELIEF
### (EXIDE)

144. Paragraphs 1 through 123 are realleged and incorporated herein by reference.

145. Defendant Exide is a person, or a successor-in-interest to a person, who at the time of disposal of any hazardous substance owned and/or operated a facility from which there was a release or threatened release of hazardous substances which has caused and continues to cause EPA to incur response costs.

146. Defendant Exide is also a person, or a successor-in-interest to a person, who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances at a facility from which there was a release or threatened release of hazardous substances which has caused and continues to cause EPA to incur response costs.

147. Pursuant to Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), Defendant Exide is jointly and severally liable to the United States for unreimbursed response costs incurred and to be incurred by the United States in connection with the Site, including enforcement costs and interest on all such costs.

148. Pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), Defendant Exide is jointly and severally liable to the United States for unreimbursed response costs incurred and to be incurred by the United States in connection with Site, including enforcement costs and interest on all such costs.

## SIXTH CLAIM FOR RELIEF
### (GOULD)

149. Paragraphs 1 through 123 are realleged and incorporated herein by reference

150. Defendant Gould is a person, or a successor-in-interest to a person, who at the time of disposal of any hazardous substance owned and/or operated a facility from which there was a release or threatened release of hazardous substances which has caused and continues to cause EPA to incur response costs.

151.     Defendant Gould is also a person, or a successor-in-interest to a person, who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances at a facility from which there was a release or threatened release of hazardous substances which has caused and continues to cause EPA to incur response costs.

152.     Pursuant to Section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2), Defendant Gould is jointly and severally liable to the United States for unreimbursed response costs incurred and to be incurred by the United States in connection with the Site, including enforcement costs and interest on all such costs.

153.     Pursuant to Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), Defendant Gould is jointly and severally liable to the United States for unreimbursed response costs incurred and to be incurred by the United States in connection with Site, including enforcement costs and interest on all such costs.

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that this Court:

a.     Order Defendants, jointly and severally, to reimburse the United States for the response costs incurred relating to the Site, including interest, under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a);

b.     Award the United States its response costs in bringing this action, including the cost of attorney time; and

c.     Grant such other and further relief as the Court deems appropriate.

Respectfully submitted,

BRUCE S. GELBER
Deputy Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

Dated:  2/10/17                     s/ Rachel Evans King
RACHEL EVANS KING
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
(202) 514-5471


WILLIAM J. HOCHUL, JR
United States Attorney
Western District of New York

MARY PAT FLEMING
Assistant United States Attorney
Western District of New York
United States Attorney's Office
138 Delaware Avenue
Buffalo, NY 14202
(716) 843-5700

OF COUNSEL:

JOCELYN SCOTT
Office of Regional Counsel
U.S. Environmental Protection Agency, Region II
290 Broadway, 17th Floor
New York, NY 10007-1866
(212) 637-3179